# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40537**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jaelen M. JOHNSON**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 2 May 2025

————————————

*Military Judge*: Lance R. Smith.

*Sentence*: Sentence adjudged 2 May 2023 by GCM convened at Aviano Air Base, Italy. Sentence entered by military judge on 25 May 2023: Bad-conduct discharge, confinement for 18 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

*For Appellant*: Captain Michael J. Bruzik, USAF; Donald C. King, Esquire.

*For Appellee*: Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, RAMÍREZ, and MASON, *Appellate Military Judges*.

Judge RAMÍREZ delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge MASON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RAMÍREZ, Judge:

Contrary to Appellant's pleas, a general court-martial comprised of a military judge convicted Appellant of one specification of assault consummated by a battery, in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928;[1] one specification of unlawful entry, in violation of Article 129, UCMJ, 10 U.S.C. § 929; and one specification of indecent recording, in violation of Article 120c, UCMJ, 10 U.S.C. § 920c. Appellant was found not guilty of sexual assault, in violation of Article 120, UCMJ, 10 U.S.C. § 920. The military judge sentenced Appellant to a bad-conduct discharge, 18 months of confinement, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. Appellant was credited with 263 days of pretrial confinement. The convening authority took no action on the findings or sentence.

Appellant raises five issues on appeal: (1) whether the military judge erred in failing to suppress evidence obtained from Appellant's cell phones; (2) whether the delay between the imposition of pretrial restraint and arraignment violated Appellant's Article 10, UCMJ, 10 U.S.C. § 810, and Rule for Courts-Martial (R.C.M.) 707 speedy trial rights; (3) whether the military judge abused his discretion in allowing the Government to admit pictures and videos under Mil. R. Evid. 404(b); (4) whether the guilty finding as to Specification 2 of Charge II, assault consummated by a battery, is factually insufficient; and (5) whether Appellant was denied speedy post-trial processing due to the delay in the Government's production of the record of trial.

We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

On 10 August 2022, Appellant, stationed at Aviano Air Base (AB), Italy, went into the base fitness center and video recorded a fellow Airman, ZP, in the men's locker room. Appellant took the video without ZP's knowledge or consent while ZP was showering. The video shows the back of ZP's naked body.

The next night, Appellant had an interaction with DF. DF was a civilian special agent with the Office of Special Investigations (OSI). DF had been assigned to Aviano AB early August 2022. Upon arriving at Aviano AB, he began staying at the temporary lodging facility (TLF) on base. His family was still in the United States; therefore, he was staying in the TLF by himself.

---

[1] Unless otherwise noted, all references to the UCMJ, the Military Rules of Evidence (Mil. R. Evid.), and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

However, even though he was by himself, he was still in a two-bedroom TLF unit.

DF had been staying in the TLF since 2 August 2022 and noticed that the door entrance of the TLF had a problem closing completely. The evening of 11 August 2022 was to be DF's last night in the TLF as he was getting ready to move into a rental home. He went to bed at approximately 2230 hours in one of the private bedrooms of his TLF unit. In addition to closing the door to his TLF unit, he closed the door to his bedroom before going to bed. To help him sleep, DF had taken his usual 5 milligrams of melatonin. It was a hot evening, and DF turned the air conditioning to the coolest setting, had the fan on high, and slept only in his underwear. He did not use a blanket to cover himself, only a sheet.

That same night, Appellant drove on base and parked his car in a parking lot away from the TLF. Appellant was also assigned to Aviano AB, but lived off base. Appellant left his wallet and keys in the car as well as a duffle bag with clothing and a towel. Appellant then walked to the TLF, entered DF's room, and touched DF without his consent. It was later discovered, after search of Appellant's iPhone that was left at the scene, that he took photos of DF's feet without DF's consent.

At trial, DF explained that after falling asleep, he felt pressure on his anus which jolted his body forward. He explained that he swiped the area with his hands, but did not feel anything, assuming it was a bug. DF fell asleep again.[2]

DF then felt a "rhythm or massage" on his left foot and began to pay attention to the feeling. DF noticed that it was "a constant rhythm," a "circular motion," and thought there was an intruder in the bedroom. At that point, DF was afraid and believed that he needed to react. Although awake at this time, DF did not hear the sound of a phone taking a picture. He also did not see a flash from a camera.

While pretending to be asleep, DF pulled his right foot back, kicked, and hit Appellant. DF then turned the bedroom light on. After DF's kick, Appellant was lying on the floor, at the base of DF's bed. Appellant was wearing a black beanie, a black mask, a black shirt, black underwear, and black shoes. Appellant's pants were off and laying on the floor. DF also saw that Appellant's cell phone ended up at the base of his bed.

While Appellant was on the ground, DF confronted him and punched Appellant in the face several times. DF then told Appellant to get on his

---

[2] This incident formed the basis for the alleged offense of sexual assault of which Appellant was found not guilty.

stomach in a prone position and instructed him to put his hands behind his back. Appellant complied.

DF then started speaking with Appellant. Appellant told DF that he was able to get into his room because the TLF unit was unlocked. Appellant also told DF, "Let's work this out. Don't call security forces, let's work this out."

With Appellant's hands behind his back, DF walked him out of the TLF and DF began to yell, "Call the police, I have [an] intruder, please call the police." No one responded. Appellant then freed himself and ran back into DF's room. DF thought Appellant was going to get a weapon, chased Appellant, and started fighting him. Ultimately, DF put Appellant in a "rear naked choke hold." Appellant was still resisting and trying to escape. As DF continued the choke hold, Appellant stopped resisting, and DF took Appellant back into the hallway. While this was occurring, a person in the neighboring TLF unit called security forces.

When security forces arrived, they saw DF and Appellant on the ground. Appellant asked one of the security forces members if he could put his pants on. Appellant also asked the security forces member if he could get his phone from DF's room. The security forces member did not allow Appellant to go back to DF's room to get his phone, but did allow Appellant to put his pants on before placing hand restraints on him. Appellant was also the subject of a pat-down search. During the pat-down search, a security forces member found that Appellant had another iPhone, and it was seized. OSI agents were also dispatched to the TLF to examine the room, where they found a separate phone belonging to Appellant. Both of Appellant's phones were Apple iPhones—an iPhone 7 that was found on his person, and an iPhone 13 that was retrieved from DF's TLF room.[3]

After conferring with the base legal office, agents from OSI sought, and received, search authorization for Appellant's two iPhones. Appellant had over one hundred photos of feet and nude buttocks on those phones. One of the photos was of DF asleep in his room. There were also videos on the two iPhones, including the one recorded on 10 August 2022 of ZP, nude, at the base gym. This latter video led to the charge and specification Appellant was convicted of in violation of Article 120c, UCMJ.

---

[3] The military judge's ruling on this matter, which we address *infra*, identifies the iPhone 7 as being found at the scene and the iPhone 13 being found on Appellant's person. The record does not well support which phone was found where; this distinction is not central to our analysis.

## II. DISCUSSION

### A. Suppression of Evidence from Appellant's Cell Phones

Appellant argues that the military judge committed plain error in failing to suppress evidence from Appellant's two cell phones. Appellant claims the searches were not authorized by an individual with control over the places where the property to be searched. Separately, Appellant argues the military judge abused his discretion in denying the motion to suppress evidence from Appellant's cell phones predating the 12 August 2022 charged offenses. We begin with an explanation of three granted requests to search: an oral request followed by an expanded written request, an expanded written request from a different special agent, and a third written request. We only address the issue of good faith and do not grant Appellant relief.

#### 1. Additional Background

The same OSI agent that found Appellant's iPhone 13 in DF's room sought search authorization for that iPhone. He and his OSI detachment commander met with the military magistrate outside the base theater on 12 August 2022. The military magistrate was Colonel JF, the medical group commander at Aviano AB. An attorney from the base legal office, the Chief of Military Justice, Captain (Capt) EM, was present telephonically.

Although it was Colonel JF's first time as a military magistrate considering a request for search authorization, he had received magistrate training from a lawyer from the base legal office as part of a "one-on-one mandatory training for commanders." The training included 80 slides, copies of which were provided to him for later reference.

Upon meeting with the OSI agent on 12 August 2022, the military magistrate placed him under oath. The OSI agent then informed the magistrate about the details of the incident at the TLF. Specifically, the OSI agent explained Appellant's involvement, that an iPhone 13 had been discovered at the scene, and that the request included authorization to search the iPhone for geolocation data as that data could place Appellant at the scene. The OSI agent did not specifically explain to the magistrate that geolocation data could be found in several areas of a phone or the technical details about geolocation data because he assumed the magistrate already knew that information. The OSI agent did, however, ask the magistrate if he had any questions. The magistrate did not. The magistrate understood probable cause to mean that there were reasonable grounds to suspect Appellant was involved in a crime. This was based on the magistrate's understanding of the probable cause standard premised on his prior magistrate training conducted by the judge advocate. Based on this, the magistrate "was convinced that there was probable cause to search [Appellant's] cell phone" and orally granted the

requested search. The OSI agent gave both recovered iPhones to the digital forensics consultant on 17 August 2022.

On 23 August 2022, the OSI agent submitted a written affidavit and Air Force Form (AF Form) 1176, *Authority to Search and Seize*, for the magistrate's consideration and signature. The affidavit referenced the oath that the OSI agent took on 12 August 2022. The affidavit was signed by both the OSI agent and the magistrate. Unlike the oral conversation at the base theater, this affidavit sought authorization to search both of Appellant's iPhones. The affidavit summarized the factual background of the 12 August 2022 incident, including that one iPhone was found at the end of DF's bed and that a second iPhone was seized from Appellant as the result of a search incident to his apprehension. The affidavit also explained that the OSI agent consulted with the base legal office which provided a legal opinion that probable cause existed, warranting the search of both iPhones for all geolocation data. However, the affidavit did not include all of the information provided to, and considered by, the magistrate during the 12 August 2022 meeting in front of the base theater. The magistrate initially denied the request with the accompanying affidavit and wanted non-substantive changes made. After changes were made, the magistrate signed the affidavit on 23 August 2022 reflecting his oral authorization from 12 August 2022. He also authorized the search of Appellant's "iPhone" by signing the AF Form 1176.

During a hearing before the military judge on Appellant's motion to suppress the searches of the two iPhones, the OSI agent testified that the first affidavit was not a verbatim rendition of the meeting with the magistrate and that the affidavit was somewhere between specific and broad, but it contained the "high points" of what was discussed. At the same hearing the magistrate first testified that everything he had been told at the meeting was included in the affidavit, but later clarified that not everything he was told was in the affidavit.

On 31 August 2022, prior to either iPhone being searched, a different OSI agent[4] prepared and submitted another sworn affidavit to the same magistrate supporting a request to expand the original authorization to search Appellant's iPhones. This included a request for all call logs, messages, social media, and email which were sent, received, or produced between 29 December 2021 and 12 August 2022. In support of the request for the expanded search authorization, the affidavit included both information not yet presented to the magistrate and information he already knew. This new information included

---

[4] This OSI agent was assigned to Headquarters OSI at Marine Corps Base Quantico, Virginia, and worked in Internal Affairs (IA). He was working on this case because of DF's position in law enforcement.

DF's allegations that Appellant touched his anus and foot, that DF turned the light on to find Appellant on the ground in his room, and the physical altercation that ensued. It also included that Appellant was wearing black clothing, but no pants. It further included that Appellant's car had been parked in the parking lot adjacent to the TLF when Appellant lived off base, and that the car was found unlocked and had Appellant's keys, wallet, and a gym bag in it. It also included that Appellant retrieved his wallet from a pair of pants which he had taken from the gym bag; that the gym bag was filled with civilian clothes;[5] and that on the night of the incident with DF, Appellant was found with only the clothes he was wearing and one iPhone on his person and one iPhone that had been left in DF's TLF bedroom. In this affidavit, the OSI agent provided an opinion that based on his education, training, experience, and all of the facts presented in the affidavit, he believed that Appellant's iPhones were being used during the alleged crimes against DF. He also stated that he had consulted with an attorney from the base legal office who agreed that there was sufficient probable cause to warrant expanding the search of Appellant's iPhones to between 29 December 2021 and 12 August 2022. The magistrate ultimately found probable cause existed and authorized the search.

The 31 August 2022 affidavit and request for an expanded search authorization, to include both of Appellant's iPhones, was based on a phone call between the Internal Affairs (IA) OSI agent, an attorney from the base legal office, and the magistrate. In this call, the OSI agent was placed under oath and provided the magistrate information about an earlier allegation from a base where Appellant had been stationed that appeared to be very similar to the allegations from 12 August 2022. The OSI agent had contacted investigators at the OSI detachments at Appellant's two prior duty locations—Kadena AB, Japan and Incirlik AB, Turkey. The OSI detachment at Incirlik AB had information about an unresolved but similar incident that occurred around 29 December 2021 where an unidentified individual matching Appellant's physical description and similar dress was found to be crawling in a stranger's room and when confronted, the individual said "please don't call the police," or words to that effect, and left. Later, someone in the Spanish dorms section of Incirlik AB saw an individual matching the same description run into a bathroom and lock the door. After a few minutes, the individual left the bathroom and departed. Although the individual was never apprehended,

---

[5] At the hearing, the OSI agent testified that based on what he knew of the incident, this additional information suggested to him that Appellant "sanitized" himself prior to going to DF's room. He elaborated that it appeared to him that Appellant had changed out of the clothes that were in the gym bag and into the all-black attire he was found wearing and left everything behind except the two iPhones that were eventually seized.

the OSI agent found this compelling for a number of reasons including: the incident occurred during the time Appellant was stationed at Incirlik AB; the individual was wearing a black mask like Appellant was on 12 August 2022; and the individual's behavior of covertly entering another person's room was similar to Appellant's actions in this case. The support for the date range included the timeframe of the incident at Incirlik AB (29 December 2021) to the date of the incident involving DF (12 August 2022).

At the motions hearing before the military judge, the magistrate testified that he found the issue of possessing two phones particularly compelling. He explained that Appellant having two phones suggested that the phones could possibly have been used for some purpose other than just a telephone and led him to believe there was a high probability the phones had a purpose other than simply a communication device. He believed the devices could contain relevant pictures or video recordings. He also testified that had he not been convinced that probable cause existed, he would not have granted search authorization; that he would reject insufficient requests because as a commander, he has a duty to protect his members, and to get to the truth; that each time he performed his role as a magistrate, he gave it the due diligence that was required, and only authorized a search after he was convinced probable cause existed. The magistrate also pointed out that he rejected the first request for authorization based on "inaccuracies" in the affidavit.

In executing the search authorization, OSI found photos of DF's feet from the night of the incident. OSI also found additional photos where the individuals photographed would have a reasonable expectation of privacy, *e.g.*, a locker room or a lodging room, as well as photos of feet taken in more public places like the beach or a food court.

On 14 October 2022, the IA OSI agent went back to the same military magistrate for a third search authorization. Once again, OSI agents consulted with the base legal office who agreed there was probable cause for the request. This request sought to remove the date-range limitation included in the second search authorization. The affidavit associated with this request specifically listed "Indecent Viewing, Recording, or Broadcasting" as a suspected offense, and included much of the information provided in previous affidavits plus additional evidence discovered during the original search. Specifically, the affidavit referred to the albums of pictures of feet during the authorized timeframe and an album which contained photos of one or more nude buttocks taken on 27 February 2022, as well as videos of a nude male showering in a locker room on 10 August 2022. The magistrate found there was probable cause and authorized the expanded search.

Prior to the commencement of Appellant's trial, the Defense moved to suppress the evidence seized from the searches of the two iPhones raising two

arguments: that there was no probable cause to grant the searches and that no exceptions applied. The military judge denied the motion in a written ruling.

As to the initial search authorization for the geolocation data, the military judge concluded, "Having reviewed [the magistrate's] probable cause determination, and granting [the magistrate] the required substantial deference, this court does not find this to be a close call. The court upholds [the magistrate's] probable cause determination on the first search authorization."

As to the search authorization of 31 August 2022, for photos and videos, the military judge wrote,

> The court agrees that the facts of the 12 August 2022 incident and the Incirlik incident do not provide facts sufficient to go rummaging about in [Appellant's] cell phones and thus would not support probable cause on their own. What saves this evidence for the Government here is the facts about the car, its contents, and the fact [that Appellant] was carrying two phones - which [the magistrate] found particularly compelling.

The military judge continued, "Once again, the execution in this case was legally sufficient, so even if an appellate court were to disagree with this court's decision on [the magistrate's] probable cause determination, the court could still apply the good faith basis in this case."

Finally, the military judge considered whether exclusion was warranted. He wrote,

> Should an appellate court disagree with this court's decision upholding [the magistrate's] probable cause determination, or in the alternative the application of the good faith basis exception, this court has also considered [Mil. R. Evid.] 311(a)(3) and *Lattin*.[6] Based on the facts in this case, the court does not believe the exclusion of the evidence here would result in appreciable deterrence of future unlawful searches and any such deterrence does not outweigh the costs to the justice system of excluding the evidence. *Lattin*, 2023 CAAF LEXIS 184[,] at *14.[7] A review of the entirety of this case does not show unlawful or unreasonable overreach on the part of OSI, or [the magistrate]. Certainly, both made judgment calls, especially during the probable cause determinations, but those judgments were made based on the facts developed and presented. As noted

---

[6] We presume the military judge was referring to *United States v. Lattin*, 83 M.J. 192, 197 (C.A.A.F. 2023).

[7] *Lattin*, 83 M.J. at 198.

in case law, 'reasonable minds frequently may differ on the question' of probable cause. ([*United States v.*] *Collins*, [No. ACM 39296,] 2022 CCA LEXIS 263[,] at *30 [A.F. Ct. Crim. App. 6 May 2022) (unpub. op.)]).

The issue of whether the searches were authorized by an individual without control over the place where the property to be searched was located was not raised before the military judge.

### 2. Law

When we review a ruling on a motion to suppress, we consider the evidence in the light most favorable to the party that prevailed on the motion. *United States v. Blackburn*, 80 M.J. 205, 211 (C.A.A.F. 2020) (citation omitted).

We review a military judge's denial of a motion to suppress for an abuse of discretion. *United States v. Lattin*, 83 M.J. 192, 198 (C.A.A.F. 2023) (citation omitted. For this standard, mere disagreement with the conclusion of the military judge is not enough to overturn their judgment. *United States v. Dooley*, 61 M.J. 258, 262 (C.A.A.F. 2005). Instead, we determine whether the military judge was clearly wrong in their determination of the facts or that their decision was influenced by an erroneous view of the law. *Id.*

Pursuant to Mil. R. Evid. 315, "[e]vidence obtained from reasonable searches conducted pursuant to a . . . search authorization . . . is admissible at trial when relevant and not otherwise inadmissible[.]" However, "[a] search authorization . . . is valid only if issued by an impartial individual" meeting certain qualifications, such as being a "commander . . . who has control over the place where the property or person to be searched is situated or found." Mil. R. Evid. 315(d).

As a matter of constitutional law, a magistrate or other official charged with responsibility for reviewing applications for search warrants and authorizations must be "neutral and detached." *Illinois v. Gates*, 462 U.S. 213, 239–40 (1983). This requires independence from the law enforcement officers "engaged in the often competitive enterprise of ferreting out crime." *Id.* at 240 (quoting *Johnson v. United States*, 333 U.S. 10, 13–14 (1948)). The magistrate must also be capable of determining on their own whether probable cause exists for the requested search. *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972).

Searches conducted pursuant to a search authorization are presumptively reasonable. *United States v. Wicks*, 73 M.J. 93, 99 (C.A.A.F. 2013). We apply a deferential standard of review to further the Fourth Amendment's[8] strong

---

[8] U.S. CONST. amend. IV.

preference for searches conducted pursuant to search authorization or a warrant. *Blackburn*, 80 M.J. at 211.

When reviewing a military magistrate's issuance of a search authorization, we do not review the probable cause determination de novo. "[T]he good faith exception could be satisfied if the agents executing the search had an objectively reasonable belief that the magistrate had a substantial basis for determining the existence of probable cause, even if the magistrate did not have such a basis." *United States v. Perkins*, 78 M.J. 381, 388 (C.A.A.F. 2019). A substantial basis exists when, under the totality of the circumstances, "there is a fair probability that evidence of a crime will be found at the identified location." *United States v. Rogers*, 67 M.J. 162, 165 (C.A.A.F. 2009) (citation omitted).

Additionally, we give great deference to the magistrate's probable cause determination. *Gates*, 462 U.S. at 236. Under evidentiary rules, "[p]robable cause to search exists when there is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched." Mil. R. Evid. 315(f).

Even when an appellate court finds there was no substantial basis to issue a search warrant or authorization, it may still uphold the search based on a finding that the law enforcement officer who applied for the warrant or authorization acted in good faith. Mil. R. Evid. 311(c)(3); *see also Perkins*, 78 M.J. at 387 ("[T]he President in promulgating [Mil. R. Evid. 311(c)(3)] was seeking to codify the good faith exception as stated in *United States v. Leon*, 468 U.S. 897 (1984) . . . ."). When relying upon the "good faith exception" to justify a search, the Government bears the burden to prove by a preponderance of the evidence each element of that exception. Mil. R. Evid. 311(d)(5)(A). The good faith exception to the exclusionary rule applies if: "(1) the seizure resulted from a search and seizure authorization issued, in relevant part, by a military magistrate; (2) the military magistrate had a substantial basis for determining probable cause existed; and (3) law enforcement reasonably and in good faith relied on the authorization." Mil. R. Evid. 311(c)(3). In applying this analysis for the good faith exception, the inquiry "is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances." *United States v. White*, 80 M.J. 322, 328 n.7 (internal quotation marks omitted) (quoting *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922 n.23)). The second element is met when the agents have an objectively reasonable belief that the magistrate had a substantial basis for probable cause. *See Perkins*, 78 M.J. at 387–88. The third element turns on whether the search authorization was facially defective or whether the police

knew the magistrate simply "rubber-stamped it." *See Backburn*, 80 M.J. at 211 (citing *United States v. Carter*, 54 M.J. 414, 421 (C.A.A.F. 2001)).

There are four circumstances where the "good faith" exception would not apply: (1) where the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false;" (2) where the magistrate "wholly abandoned his judicial role;" (3) where the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant is so "facially deficient . . . in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (citations omitted).

If we decide that the good faith exception applies, then we do not have to address whether probable cause for the search authorization was lacking. *Perkins*, 78 M.J. at 386–87 (citing *United States v. Lopez*, 35 M.J. 35, 39 (C.M.A. 1992)) (explaining that a court need not determine if there was sufficient probable cause if it concludes that the good faith exception to the exclusionary rule applies).

### 3. Analysis

Here we address only Appellant's claim the military judge abused his discretion in denying the motion to suppress evidence from Appellant's iPhones that predated 12 August 2022, based on good faith. We do not address Appellant's argument that the magistrate lacked control over the place where the property to be searched was situated because Appellant has waived this argument. Arguments for suppression of evidence that are not made at trial are waived. *Perkins*, 78 M.J. at 390. An appellant "must make a 'particularized objection' to the admission of evidence, otherwise the issue is waived and may not be raised on appeal." *Id.* (citation omitted). "[A] particularized objection is necessary so that the government has the opportunity to present relevant evidence that might be reviewed on appeal." *Id.* (citation omitted). Here, Appellant did not raise this issue at trial when he argued that there was no probable cause for the search authorization. Instead, as explained above, Appellant argued only that the search authorization was not supported by probable cause and that no exception applied. Therefore, we will not address the merits of this argument.

As to the issue of whether the military judge abused his discretion in denying the defense motion to suppress evidence from Appellant's iPhones that predated the 12 August 2022 charged offenses, we address only the good faith exception. As explained above, if we decide that this exception applies, we need not address whether there was probable cause for the search authorization. *Perkins*, 78 M.J. at 386–87. We find that even if the search authorization for

evidence predating the TLF offense was lacking in probable cause, the good faith exception applies.

When contemplating good faith, the military judge considered the same facts we articulated here. We find the military judge was not clearly wrong in his determination of those facts, which were based on sworn testimony at the hearing. Importantly, Appellant does not attack those facts. Instead, Appellant's argument is insinuating that the magistrate was only permitted to rely upon information contained in the affidavit and not any previously incorporated sworn oral testimony provided in the 12 August 2022 search authorization consultation. By way of example, Appellant explains that the date range regarding the incidents at Incirlik AB are not in the affidavit. We agree with Appellant. They were not. They were, however, provided to the magistrate orally and under oath prior to the magistrate authorizing the search of the iPhones. We are cognizant of the fact that there was information that OSI told the magistrate when seeking search authorization that was not in the affidavit. We do not find this lack of information in the affidavit fatal for four reasons. First, the magistrate found probable cause with the information provided to him orally; second, the agent provided the information under oath; third, the information was evaluated by an attorney who agreed with the agent that probable cause existed; and fourth, a written affidavit is not required to authorize a search authorization. As to the third reason, our superior court has expressed that law enforcement's reliance on an attorney's advice to be "most significant" in determining objectively reasonable belief in substantial basis for probable cause. *Blackburn*, 80 M.J. at 212 (citing *Perkins*, 78 M.J. at 388).

The military judge also addressed these issues. He explained:

> [A]lthough the agents provided conclusions (e.g., location data would be on the phone and the phones were used during the commission of the offenses), they were not "bare bones" conclusions, or "hunches" as argued by the Defense. As described in detail above, the agents provided sufficient facts that put meat on the bones of their conclusions. The agents successfully provided sufficient facts to persuade [the base legal office attorney] and [the magistrate] that probable cause existed. Based on the facts in this case, the court also finds a reasonable law enforcement [officer] would have an objectively reasonable belief that [the magistrate] had a "substantial basis" for determining the existence of probable cause.

Next, Appellant points us to an unpublished opinion from this court, *United States v. Toledo*, No. ACM 39232, 2018 CCA LEXIS 497, at *17 (A.F. Ct. Crim. App. 16 Oct. 2018) (unpub. op.), where we found no probable cause and where the good faith exception did not apply. However, this court in *Toledo* found an

assertion by a civilian police officer to be "demonstrably untrue, and yet it was relied upon by the judge to issue the search warrant." *Toledo*, unpub. op. at *19. Here, we do not have law enforcement providing untrue information to the magistrate.

Similarly, Appellant does not claim that the military judge's decision was influenced by an erroneous view of the law. We agree and find that the military judge applied the right test for the good faith doctrine. Nonetheless, Appellant argues the OSI agent "could not have reasonably and with good faith relied upon the issuance of the authorization" because he, himself, provided the magistrate insufficient information to justify granting the search authorization. We disagree. *See Perkins*, 78 M.J. at 388 (observing that a law enforcement officer's good faith belief in the existence of probable cause was reasonable even if the advice of counsel informing that opinion ultimately turns out to be incorrect) (citation omitted).

The military judge, in his written ruling, found that each element of the good faith exception applied. He found the search was based on authorization issued by a military magistrate, who had a substantial basis for determining probable cause existed, and that law enforcement reasonably and in good faith relied on the authorization. The military judge also found that the magistrate did not wholly abandon his judicial role and was not merely acting as a rubber stamp for the OSI; that the OSI did not intentionally or recklessly provide false information; and that the authorization was not so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers could not reasonably presume it to be valid.

We find there to be a factual basis to each of the military judge's findings and conclusions, and therefore find them not clearly erroneous. The magistrate who authorized the searches was a duly authorized military magistrate who received training from a judge advocate. To determine whether the search requests were supported by probable cause, the magistrate received information that there was an individual matching Appellant's description at the same base where Appellant had been stationed previously, at the same time that Appellant had been stationed there, engaging in activity strikingly similar to the conduct that Appellant had been alleged to have committed on 12 August 2022. Additionally, there was nothing before the military judge to conclude that the magistrate was misled by the OSI agents who were under oath. Nor was there any basis to conclude that those agents knew the information they provided was false, nor that they acted in reckless disregard in providing information which a reasonable person knew or should have known was false. In reviewing the information before the magistrate and the ensuing search authorization, law enforcement reasonably and in good faith relied on the authorization. Therefore, the executing officers reasonably could

presume it to be valid. Even if there were not a sufficient nexus for probable cause, OSI's belief that the magistrate had a substantial basis for probable cause was reasonable.

In conclusion, we find that the requisites for application of the good faith exception are satisfied here. The magistrate was competent, OSI's belief in the magistrate's substantial basis for probable cause was reasonable, and the magistrate did not rubber-stamp the request. The military judge did not abuse his discretion in finding that the good faith exception applied.

## B. Delay Between the Imposition of Pretrial Restraint and Arraignment

Appellant argues the delay between the imposition of pretrial restraint and arraignment violated his Article 10, UCMJ, and R.C.M. 707 speedy trial rights. We disagree.

### 1. Additional Background

We find the military judge's findings of fact on this issue are substantiated by the sworn testimony in the record, and we adopt those facts as set forth below.

Law enforcement apprehended Appellant on 12 August 2022. He was released to his unit and restricted to base until placed in pretrial confinement on 15 August 2022. He remained there until his court-martial, which commenced on 23 February 2023.

In the meantime, OSI continued its investigation, including collecting and analyzing evidence from Appellant's iPhones. The base legal office provided ongoing advice to OSI during the continuation of this investigation and worked with senior trial counsel. The base legal office also worked with the general court-martial convening authority's (GCMCA's) legal office (3 AF/JA) to prepare charges based on the evidence collected, including new information that was unknown when Appellant began pretrial confinement.

The vast majority of the investigation in this case involved obtaining and reviewing forensic evidence, which required extensive coordination. This coordination included the OSI Inspector General at Quantico, Virginia, because one victim, DF, was an OSI agent. Within two days of Appellant breaking into DF's room, special agents from Quantico arrived at Aviano AB and took control of the investigation. They sent Appellant's two iPhones for forensic analysis after the magistrate's 12 August 2022 oral search authorization, dusted the crime scene for fingerprints, and collected bed sheets which they sent to the United States Army Criminal Investigation Laboratory (USACIL). OSI's digital forensic consultant received and began processing

Appellant's two iPhones on 17 August 2022 and completed the extraction of data from Appellant's iPhone 13 on 19 August 2022.

While the cell phone evidence was being processed, the Aviano AB legal office learned new information suggesting Appellant might have also committed other violations of the UCMJ in the past. By 22 August 2022, the base legal office had a report that someone matching Appellant's description had allegedly engaged in similar misconduct at Incirlik AB during a time when Appellant was stationed there. This led OSI to request an expanded search authorization from the magistrate on 31 August 2022 for additional evidence beyond location information.

During the weeks of 29 August 2022 and 5 September 2022, the Aviano AB legal office coordinated with OSI and learned that OSI had accessed Appellant's iPhone. On 6 September 2022, the digital forensic consultant transferred data from the iPhone 13 to a separate hard drive. The consultant also began to examine the iPhone 7, which was more technologically complicated and required "brute force" passcode bypass.

Starting the week of 12 September 2022, OSI and the Aviano AB legal office began attempting to identify other potential victims based on dozens of photos and videos discovered on Appellant's iPhone 13. This occurred during a search of these devices for data with a specified timeframe beginning with the date of the alleged incident at Incirlik AB. Investigators visited the base gym at Aviano AB to compare details from these videos and photos with the physical premises.

With this additional evidence in hand, the Aviano AB legal office completed an initial proof analysis during the week prior to 26 September 2022 and sent it to 3 AF/JA for review.

On 3 October 2022, the Aviano AB legal office coordinated with OSI on plans to seek an expanded search authorization for Appellant's iPhones to remove the previous date restrictions. Trial counsel also requested a senior trial counsel (STC) be detailed to the case.

On 11 October 2022, OSI and trial counsel discussed the newly discovered evidence found on one of Appellant's iPhones including the fitness center photos and videos.

On 13 October 2022, the Aviano AB legal office sent draft charges to 3 AF/JA for review and comment. On 14 October 2024, OSI submitted a request for the expanded search authorization without date restrictions. 3 AF/JA responded on 18 October 2022 with comments on the draft charges. Two days later, the final draft charges were sent to the STC for review.

On 24 October 2022, the Aviano AB legal office contacted the base fitness center concerning the shower video investigation. Two days later, the fitness center provided access to the pertinent records which trial counsel used to narrow the list of potential victims to 27. This information would lead to an additional charge being preferred to Appellant's case.

On 26 October 2022, the digital forensic consultant published a report explaining that Appellant's iPhone 7 was still undergoing "brute force" passcode bypass.

Appellant was represented by both military and civilian defense counsel. On 27 October 2022, trial counsel sent Appellant's trial defense counsel the evidence to accompany the preferral of the first set of charges which occurred the next day. Trial counsel also provided 7 November 2022 as the Government's ready date for an Article 32, UCMJ, preliminary hearing. 10 U.S.C. § 832. Trial defense counsel did not respond in providing a suggested preliminary hearing date.

On 7 November 2022, trial counsel emailed trial defense counsel again about a date for the preliminary hearing. Trial defense counsel did not respond this time, either. Yet again, on 16 November 2022, the Aviano AB Chief of Military Justice emailed both trial defense counsel seeking their earliest available date for an Article 32, UCMJ, hearing. Five days later, trial defense counsel responded to this email stating, "Working on getting Defense availability to you and will follow up as soon as possible." Trial defense counsel, however, did not follow up.

On 29 November 2022, the Chief of Military Justice sent another email seeking defense availability for a preliminary hearing. On 12 December 2022, civilian defense counsel proposed a hearing date of 28 December 2022. The Government abided by this request. The preliminary hearing officer issued a report on 12 January 2023 finding probable cause. On 20 January 2023, the additional charge was preferred.

On 20 January 2023, the special court-martial convening authority (SPCMCA) signed a memorandum excluding two periods of time from the R.C.M. 707 speedy trial clock. First, the SPCMCA excluded 27 days (11 October 2022 – 6 November 2022) to allow for time to identify and to secure other evidence from a substantial witness, the victim of the shower video recording. Second, the SPCMCA excluded 51 days (7 November 2022 – 27 December 2022) due to trial defense counsel's unavailability for the preliminary hearing.

On 24 January 2023, both the original charges and the additional charge were referred to a general court-martial and were served on Appellant on 26 January 2023. On 1 February 2023, trial counsel emailed trial defense counsel and notified them that the Prosecution's trial ready date was 20 February 2023

and requested their availability. On 6 February 2023, trial defense counsel informed trial counsel that their earliest available date for trial was 1 May 2023. In a memorandum, the parties agreed to an exclusion of time between 20 February 2023 and 1 May 2023. On 2 February 2023, Appellant, through counsel, demanded a speedy trial. Appellant was arraigned on 23 February 2023.

Appellant filed a memorandum for record (MFR) for the military judge to consider regarding his pretrial confinement conditions. In that MFR, Appellant complained of occasionally not being allowed to shower or missing meals; guards telling threatening stories and discussing details of inmates' cases around other inmates; on certain occasions not having toilet paper; confinement facility staff saying Appellant's medication too loudly during medication call and occasionally missing medication call; and having difficulty getting medical care in a timely manner. Appellant alleged this caused anxiety and fear.

At trial, Appellant filed a motion to dismiss regarding the purported delay. The Prosecution conceded the R.C.M. 707 speedy trial clock began on 13 August 2022 and stopped on 23 February 2023. In his written ruling, the military judge agreed, finding 195 days had elapsed under the R.C.M. 707 speedy trial clock. The military judge found, however, that only 144 days had elapsed if the SPCMCA's exclusion of time related to trial defense counsel's availability for the preliminary hearing was considered. In addition, the military judge found only 117 days had elapsed if the SPCMCA's other exclusion of time concerning evidence about the shower video victim was also considered. Finally, the military judge found only 114 days had elapsed if three additional days were excluded as specified in the confirmation memorandum. Finding the exclusions proper, the military judge denied the Defense's motion.

### 2. Law

#### a. Standard of Review

"In the military justice system, an accused's right to a speedy trial flows from various sources, including the Sixth Amendment,[9] Article 10 of the Uniform Code of Military Justice, and R.C.M. 707 of the Manual for Courts-Martial." *United States v. Cooper*, 58 M.J. 54, 57 (C.A.A.F. 2003).

"This Court conducts a de novo review of speedy trial claims." *United States v. Guyton,* 82 M.J. 146, 151 (C.A.A.F. 2022) (citations omitted).

#### b. Article 10, UCMJ

---

[9] U.S. CONST. amend. VI.

An accused "who is charged with an offense . . . may be ordered into arrest or confinement as the circumstances require." Article 10(a)(1), UCMJ, 10 U.S.C. § 810(a)(1). Article 10, UCMJ, explains that "when a servicemember is placed in pretrial confinement, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him." *Cooper*, 58 M.J. at 58 (internal quotation marks and citation omitted). "[T]he touch stone for measurement of compliance" with Article 10, UCMJ, "is not constant motion, but reasonable diligence in bringing the charges to trial." *Id.* (citation omitted). "Brief periods of inactivity in an otherwise active prosecution are not unreasonable or oppressive." *Id.* (citations omitted).

"The procedural framework for analyzing Article 10 issues examines the length of the delay, the reasons for the delay, whether the accused made a demand for a speedy trial, and prejudice to the accused." *United States v. Thompson*, 68 M.J. 308, 312 (C.A.A.F. 2010) (citation omitted). This framework is derived from the Sixth Amendment test set forth by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). *Id.* Article 10, UCMJ, however, "imposes a more stringent speedy trial standard than the Sixth Amendment." *Id.* "In conducting our analysis, we remain mindful that we are looking at the proceeding as a whole and not mere speed." *Id.* (internal quotation marks and citation omitted).

"To determine how [these] factor[s] affect[ ] our Article 10, UCMJ, inquiry, we consider the particular circumstances of the case because the delay that can be tolerated for an ordinary street crime is considerably less than [that] for a serious, complex conspiracy charge." *United States v. Cooley*, 75 M.J. 247, 260 (C.A.A.F. 2016) (fourth alteration in original) (internal quotation marks and citation omitted). As we consider this factor, we take into account "the seriousness of the offense, the complexity of the case, the availability of proof, and additional circumstances . . . ." *Id.* (internal quotation marks omitted). Under appropriate circumstances, investigative delays may be reasonable because "the Government has the right (if not the obligation) to thoroughly investigate a case before proceeding to trial." *United States v. Cossio*, 64 M.J. 254, 258 (C.A.A.F. 2007). Relatedly, the "immediate steps" requirement in Article 10, UCMJ, does not oblige the Government to "bring court-martial charges against a member being held in pretrial confinement before collecting the evidence to conduct a successful prosecution. Nor does it mean that investigators and prosecutors must busy themselves with case preparation while they are waiting for the evidence necessary to understand the case." *United States v. Plants*, 57 M.J. 664, 668–69 (A.F. Ct. Crim. App. 2002) (citation omitted).

Regarding prejudice, "[g]iven that [Article 10, UCMJ], is triggered only when an accused is in pretrial confinement, the prejudice prong of the balancing test triggered by pretrial confinement requires something more than pretrial confinement alone." *Id.* at 262. "The three recognized interests of prejudice are: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Id.* "The inability of [an accused] to adequately prepare his case is the 'most serious' interest to be considered when reviewing alleged speedy trial violations for prejudice 'because the inability of [an accused] adequately to prepare his case skews the fairness of the entire system.'" *Id.* (citation omitted).

### c. R.C.M. 707

Pursuant to R.C.M. 707, an accused must be brought to trial within 120 days after the preferral of charges. *United States v. Guyton*, 82 M.J. 146, 151 (C.A.A.F. 2022).

An accused is "brought to trial" for purposes of R.C.M. 707 at the time of arraignment. *Id.* "Applying the speedy trial provisions of R.C.M. 707(c) does not merely consist of calculating the passage of calendar days." *Id.* Certain days do not count for the purpose of computing time. *Id.* By way of example, before referral, pretrial delays approved by the convening authority are excluded from the 120-day clock. *Id.* Additionally, after-the-fact approval of a delay is not precluded. *Id.* The decision to grant or deny a reasonable delay is a matter within the sole discretion of the convening authority." R.C.M. 707(c)(1), Discussion. Based on the facts and circumstances of each case, the reason for delay is tested for "good cause" and the length of time must be "reasonable." *Guyton*, 82 M.J. at 151 (citations omitted).

### 3. Analysis

#### a. Article 10, UCMJ

Appellant points to the following in the alleged violation of his Article 10, UCMJ, protections: the delay in the preferring of charges; the delay in requesting circuit trial counsel; the time it took to conduct the Article 32, UCMJ, hearing; the time it took to prefer the additional charge; and the delay in scheduling the arraignment. According to Appellant, "the Government's delay appears to have come from an office unprepared to address pretrial confinement and serious offenses." As for prejudice, Appellant alleges that he had difficulty accessing his attorneys; he could "not access electronic resources to any significant degree to assist in his defense" according to a memorandum that Appellant prepared in support of his motion to dismiss; and he had "trouble breathing, inability to sleep, soreness in his throat, and chest pains."

In determining whether an Article 10, UCMJ, violation occurred, we examine the length of the delay, the reasons for the delay, whether the accused made a demand for speedy trial, and a showing of prejudice. *See Thompson*, 68 M.J. at 312. We consider the particular circumstances of this case and take into account the seriousness of the offenses, the complexity of the case, the availability of proof, and additional circumstances. *See Cooley*, 75 M.J. at 260. The parties do not dispute the length of the time between pretrial confinement and arraignment (195 days) or that Appellant made a demand for a speedy trial, albeit not until 2 February 2023 (day 174).[10]

On the facts before us, the length of the delay and the reasons for it are not unreasonable. Even though there were brief periods of inactivity, the investigation and the Prosecution proceeded with forward momentum. While we do not find "constant motion," we do find reasonable diligence in moving the charges forward to trial. Most of the investigation, while Appellant was in pretrial confinement, involved digital evidence locked inside two iPhones, which required extensive OSI coordination. The investigation also involved seeking multiple search authorizations as more and more evidence was discovered. Further, once the video of ZP was discovered, it took additional time to identify who he was by cross referencing males of a certain skin tone, that had gone to a specific base gym, during certain hours. We also do not find unreasonable delay in the time needed for communication between the base legal office and the GCMCA's legal office which had ultimate responsibility over Appellant's court-martial, including the drafting of charges.

In particular, we do not fault the Prosecution for the delays in scheduling the Article 32, UCMJ, hearing, and the arraignment. The record is clear that the reason for these delays is largely attributable to the unavailability and unresponsiveness of trial defense counsel from 27 October 2022 to 21 November 2022. We further find, based on the evidence before us, the Government's request for the appointment of circuit trial counsel did not contribute to any delay in the processing of Appellant's court-martial.

We now turn to prejudice and review the proceeding as a whole. We find Appellant did experience some distress. To be sure, simply because an accused is in pretrial confinement does not mean he should miss the minimum daily comforts of life such as showers or meals. The question before us, however, is whether this distress was more than the usual effect of pretrial confinement and the associated anxiety that typically comes from being confined. We recognize that being in confinement necessarily means that it is more

---

[10] While Appellant demanded a speedy trial, we note that his trial defense counsel were not available for the dates proposed by the Prosecution for both the Article 32, UCMJ, preliminary hearing and later the trial dates.

cumbersome for an accused to meet with his counsel. We also recognize that an individual's health might be compromised to a greater extent while in confinement. Nevertheless, these conditions were not so onerous that they created unique "prejudice" to Appellant, and therefore we find no violation of Article 10, UCMJ, based on the facts and circumstances of Appellant's case.

### b. R.C.M. 707

Pursuant to R.C.M. 707, an accused should be brought to trial within 120 days after the beginning of pretrial confinement in cases where such confinement predates the accused's arraignment. In this case, 195 days elapsed prior to arraignment; however, we find the Prosecution did not violate the R.C.M. 707 speedy trial provision as this Rule expressly provides for the exclusion of reasonable periods of delay at the discretion of the convening authority. In this case, we find that good cause existed for the convening authority's decision to exclude the specific periods of delay referenced above from the speedy trial computation and find the convening authority did not abuse his discretion. When these periods of delay are excluded, the remaining period of delay is only 114 days. Based on the facts and circumstances in this case, we find there was good cause for delay.

While the Prosecution had enough evidence to proceed sooner on the original charge concerning the 12 August 2022 incident involving DF at the TLF, there was good cause for the convening authority to grant the first exclusion of time from 11 October 2022 to 6 November 2022 in order to allow additional time to identify and secure evidence pertaining to an additional victim, ZP, who was unknown to the Government at the outset of the case. R.C.M. 601(e )(2), Discussion ("Ordinarily all known charges should be referred to a single court-martial.").

When OSI informed trial counsel on 11 October 2022 of newly discovered evidence in the form of surreptitious shower photos and videos, it was reasonable for investigators to take additional time to take a deeper dive to discover exact location data from the photo and video evidence and to work directly with the base fitness center staff to identify the victim. The investigation ended on 6 November 2022 when the Prosecution provided its Article 32, UCMJ, hearing ready date to trial defense counsel.[11]

We also find good cause for the second time period excluded by the convening authority from 7 November 2022 to 27 December 2022 due to trial defense counsel's unavailability for the Article 32, UCMJ, preliminary hearing. The Prosecution informed trial defense counsel that its Article 32 ready date

---

[11] We note the Prosecution did not request the further exclusion of time until 2 December 2022, when victim ZP was identified.

was 7 November 2022. Trial defense counsel requested the Article 32 hearing be scheduled on 28 December 2022. The Prosecution was not responsible for the trial defense counsel's unavailability. As such, the delay between 7 November and 27 December 2022 is attributable to Appellant and the exclusion of this time is reasonable.

Having determined the convening authority's exclusions of time were based on good cause and reasonable, the remaining time on the R.C.M. 707 speedy trial clock at the time Appellant was arraigned was less than 120 days. Therefore, we find no R.C.M. 707 speedy trial violation in this case, as the Rule allows a maximum of 120 days.

## C. Admission of Pictures and Videos under Mil. R. Evid. 404(b)

Appellant claims the military judge abused his discretion when he denied the Defense's motion challenging evidence under Mil. R. Evid. 404(b). We disagree.

### 1. Additional Background

The Specification of Charge III alleges that Appellant at Aviano AB, on 12 August 2022, unlawfully broke and entered DF's room with intent to commit assault consummated by a battery. The alleged battery was touching DF's feet without consent.

The Specification of the Additional Charge alleges Appellant knowingly made a recording of the private area of ZP on 10 August 2022, without justification or lawful authorization, without ZP's consent, and under circumstances in which ZP had a reasonable expectation of privacy.

Prior to trial, the Prosecution provided the trial defense counsel with notice of other crimes, wrongs, and acts that it intended to offer as evidence pursuant to Mil. R. Evid. 404(b). It sought to introduce 13 incidents. The Defense objected to five of those incidents, and the military judge held a hearing on the admissibility of those five contested incidents. We provide those incidents as they were written in the Mil. R. Evid. 404(b) notice and as the military judge considered them:

> On or about 8 August 2022 at 03:36 at around UTC[12] inside Aviano Air Base's Wyvern Gym male locker room [Appellant] made a recording on his cell phone. In this recording [Appellant] can be seen wearing the same black shoes from IMG_9249, IMG_9248, IMG_9249, IMG_ 9251, and IMG _9252 as he walks towards a locker room shower[,] gets down on the floor[,] and

---

[12] UTC stands for Coordinated Universal Time and replaced the use of Greenwich Mean Time (GMT).

attempts to stick his phone in the shower to record an individual showering. The Government previously provided this recording labeled as IMG_9204 to the Defense. The Government intends to use this evidence to show identity, and the common scheme or plan [Appellant] uses by getting the locker room floor by the side of the shower and reaching his phone around the shower wall to attempt to record individuals as they shower.

A search of [Appellant's] iPhone 13 revealed that [Appellant] recorded numerous videos focusing on other individual's feet. Additionally, about 245 photos of other individual's feet were found on [Appellant's] iPhone 13. The Government intends to elicit testimony about the general nature of these photos and videos to show [Appellant's] motive and intent to commit the offense alleged in Charge III and its specification. Namely that [Appellant] has an interest in feet. All of these videos and photos were previously provided to the Defense.

On or about 4 August 2022 at around 02:00 UTC [Appellant] made 5 recordings outside what appears to be the lodging facility at Aviano Air Base focusing in through a window on an individual lying in bed with his or her feet out. These recordings labeled IMG_9085, IMG_9079, IMG_9078, IMG_9075, and JMG_9074 were previously provided to the Defense. The Government intends to use this evidence to show common scheme, plan, preparation, and intent to commit the offense alleged in Charge III and its specification.

On or about 4 August 2022 at around 02:00 UTC [Appellant] took 15 photos from outside what appears to be the lodging facility at Aviano Air Base focusing in through a window on an individual lying in bed with his or her feet out. These photos were previously provided to the Defense. The Government intends to use this evidence to show common scheme, plan, preparation, and intent to commit the offense alleged in Charge III and its specification.

The military judge allowed the parties to brief and argue these issues. After reviewing the evidence, applying the test for admissibility of uncharged misconduct set out in *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989), and applying Mil. R. Evid. 403 to the evidence, he concluded that the proffered Mil. R. Evid. 404(b) evidence was admissible subject to certain limitations, not at issue on appeal.

**2. Law**

We review a military judge's Mil. R. Evid. 404(b) ruling for an abuse of discretion. *United States v. Wilson*, 84 M.J. 383, 390 (C.A.A.F. 2024). When we apply the abuse of discretion standard, mere disagreement with the conclusion of the military judge is not enough to overturn his decision. *Dooley*, 61 M.J. at 262. Instead, we determine whether the military judge was clearly wrong in his determination of the facts or that his decision was influenced by an erroneous view of the law. *Id.* "'[T]he abuse of discretion standard of review recognizes that a judge has a wide range of choices and will not be reversed so long as the decision remains within that range.'" *Wilson*, 84 M.J. at 390–91 (alteration in original) (citation omitted).

We review the admissibility of uncharged misconduct under Mil. R. Evid. 404(b) using a three-part test. *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (citing *Reynolds*, 29 M.J. at 109). The test asks the following questions: (1) Does the evidence reasonably support a finding by the factfinder that the accused committed prior crimes, wrongs, or acts?[13] (2) "What fact of consequence is made more or less probable by the existence of this evidence?" and (3) "Is the probative value substantially outweighed by the danger of unfair prejudice?" *Id.* (citation omitted).

"Evidence of uncharged misconduct is impermissible for the purpose of showing a predisposition toward crime or criminal character." *Id.* (footnote omitted). "However, uncharged misconduct can be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* (footnote and internal quotation marks omitted). "Evidence may be admissible for some purposes but not others." *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citation omitted). Mil. R. Evid. 404(b) "is viewed as an inclusionary rule under which evidence of logically relevant prior acts is admissible except when tending to prove only criminal disposition." *United States v. Franklin*, 35 M.J. 311, 316 (C.M.A. 1992) (internal quotation marks and citation omitted). Regarding the third *Reynolds* factor, the danger of unfair prejudice is precipitously less in a military judge alone trial when a military judge "emphasized that he would consider the uncharged acts only for the limited purpose of establishing a common scheme or plan and not as improper propensity evidence or for any purpose prohibited by [Mil. R. Evid.] 404(b)." *United States v. Greene-Watson*, __ M.J. __, No. 24-0096, 2025 CAAF LEXIS 186, \*18–19 (C.A.A.F. 11 Mar. 2025); *see also id.* at \*23–24 (Sparks, J., concurring in part and in the judgment) ("The risk of relevant evidence causing

---

[13] "[T]he standard for meeting this factor is quite low." *United States v. Dorsey*, 38 M.J. 244, 246 (C.M.A. 1993) (citation omitted).

unfair prejudice in a bench trial is nonexistent because the risk addressed in *Staton* [*i.e.*, that a lay trier of fact will treat evidence of uncharged acts as propensity evidence] is eliminated by the absence of a members panel.").

### 3. Analysis

Appellant first argues that the challenged Mil. R. Evid. 404(b) evidence admitted at his court-martial should have been excluded because it was cumulative to evidence of the charged offenses themselves, or other evidence offered under Mil. R. Evid. 404(b) that was not challenged. Appellant also argues any probative value the challenged Mil. R. Evid. 404(b) evidence did hold was substantially outweighed by the danger of unfair prejudice resulting from admitting evidence of what could have been charged as an attempt to commit an indecent recording in violation of Article 120c, UCMJ. According to Appellant, under both Mil. R. Evid. 403 and Mil. R. Evid. 404(b), the value of this evidence did not merit the admission of this "cumulative and prejudicial material."

Appellant then argues that the evidence admitted to show his preparation, intent, and motive "similarly returned little probative bang for its prejudicial buck." According to Appellant, the military judge applied the legal principles of Mil. R. Evid. 404(b) and Mil. R. Evid. 403 to the facts "in a clearly unreasonable manner, thereby abusing his discretion."

For the reasons stated below, we do not find that the military judge abused his discretion in admitting the challenged evidence. He was not clearly wrong in his determination of the facts, and his decision was not influenced by an erroneous view of the law, particularly in the context of this judge alone trial. Additionally, we note that the military judge provided a detailed written analysis in this case. As a consequence, his ruling is entitled to full deference by this court under the abuse of discretion standard. *See United States v. St. Jean*, 83 M.J. 109, 113–14 (C.A.A.F. 2023). Nothing in the record leads us to a conclusion that the military judge considered any of the admitted Mil. R. Evid. 404(b) evidence for an impermissible propensity purpose.

#### a. The 4 August 2022 Evidence (TLF)

The military judge rejected the Prosecution's theory that the evidence tended to show that Appellant had a common scheme or plan. Instead, the military judge found this evidence admissible when offered to show preparation and intent.

The military judge found that a factfinder could determine this other act occurred and that Appellant committed it by a preponderance of the evidence. He also found that the evidence was relevant as preparation and intent and a factfinder could determine this evidence tended to show Appellant was preparing for the event that eventually occurred on 12 August 2022. According

to the military judge, viewed as a preparatory step, the factfinder could find the evidence tended to prove Appellant entered DF's TLF room on 12 August 2022, which was a fact of consequence in this case. The military judge further found that the recording was also relevant as to Appellant's intent as it tended to show his state of mind, particularly his interest in feet; and that comparing the 4 August 2022 recording to the offense alleged in the Specification of Charge III (unlawful entry), which was the conduct involving DF, Appellant's state of mind was sufficiently similar to show his intent.

The military judge also applied Mil. R. Evid. 403 to the evidence. He found that the 4 August 2022 recording did not show any offense involving touching, and as such, the Mil. R. Evid. 404(b) evidence was less serious than the facts that would be presented to prove the Specification of Charge III itself. The military judge next found that the risk that this evidence would be used for any impermissible purposes, confuse the issues, or mislead the factfinder was eliminated because the military judge was the factfinder, not a panel. Additionally, he found that the presentation of the evidence would not lead to undue delays or waste of time. He then concluded that the probative value was not substantially outweighed by the danger of unfair prejudice, or any other factor under Mil. R. Evid. 403. Ultimately, the military judge found that the 4 August 2022 evidence (Appellant making 5 recordings and taking 15 photos outside of the Aviano AB lodging facility) was relevant to Appellant's intent on 12 August 2022 and was therefore admissible for that purpose.

As to this issue we find that the military judge's facts were based on the evidence before him and as such, he was not clearly wrong in his determination of the facts. Additionally, the military judge's conclusion that the evidence was relevant to show preparation and intent was not an erroneous view of the law. "Where evidence of other crimes is offered to prove intent, the relevancy of the other crime is derived from the accused's possession of the same state of mind in the commission of both crimes." *United States v. Dorsey*, 38 M.J. 244, 247 (C.M.A. 1993). Here, the 4 August 2022 evidence all centered around photos and videos of feet. It is clear to us that both the 4 August 2022 evidence and the allegation in Charge III center around an intent and fascination to be around feet, whether that is to photograph them, make a video recording of them, or touch them. The Prosecution proved intent to commit this offense by showing that Appellant previously possessed the same state of mind.

### b. The 8 August 2022 Evidence (Gym)

The military judge first found that a factfinder could determine Appellant made the recording and committed the acts depicted in the recording by a preponderance of the evidence. He found the evidence relevant to prove identity and common scheme or plan.

The military judge found that the evidence showed the individual making the recording was wearing similar shoes to the individual making a recording two days later, on 10 August 2022. He then found that the distinctive shoe evidence was relevant and supported the Additional Charge involving ZP, that is Appellant's identity was a fact of consequence in this case and this evidence tended to show Appellant as the perpetrator.

Next, the military judge found that the scheme or plan employed by Appellant in the 8 August 2022 recording was relevant as it was nearly identical to his actions two days later. The military judge continued that both the "other acts" and the offense alleged in the Additional Charge involve a victim who is in the shower and while Appellant is aware of what he is doing, the individuals in the showers were not. Additionally, the military judge explained that the location of the acts was identical: the showers in the male locker room at Wyvern Fitness Center at Aviano AB. Next, he found that the nature and circumstances of the acts were identical: Appellant secretly recording an individual in the shower by placing a phone under the shower curtain. Finally, he found that the time span between the events was only two days, making it even more relevant.

Having found the requisite relevance, the military judge turned to the Mil. R. Evid. 403 balancing test. He found that because the 8 August 2022 recording only captured the scheme/plan and not a nude individual, it diminished any prejudicial effect. Because it was a judge alone trial, there was no danger of the evidence being used for any improper purpose and no concern the evidence would mislead the factfinder, confuse the issues, or cause undue delay or waste of the trial court's time. The military judge concluded that the probative value of the evidence of identity and common scheme/plan was not substantially outweighed by the danger of unfair prejudice. As such, the military judge found the recording was admissible for its tendency to establish Appellant's identity on 10 August 2022, and to show his common scheme/plan of secretly attempting to record nude males while they showered in the locker room by placing a phone under a shower curtain.

Here, we find that the military judge's facts were based on the evidence before him and therefore, he was not clearly wrong in his determination of the facts. Further, the military judge's conclusion that the evidence was relevant to show a common scheme or plan was not an erroneous view of the law. The scheme Appellant used on 8 August 2022 (surreptitiously attempting to record a nude man showering in the base gym locker room) was very similar to his alleged actions two days later (surreptitiously attempting to record a nude man showering in the base gym locker room). Our superior court has "previously held that one proper purpose of such evidence is to prove the existence of a plan or scheme." *Hyppolite*, 79 M.J. at 165 (citations omitted).

### c. Testimony of Pictures and Videos of Feet from Appellant's iPhone

The Prosecution intended to elicit evidence, through testimony only, that Appellant had many photos and recordings of feet on his iPhones, on the theory that such testimony would show his intent and motive. The testimony would include the images and recordings appeared to have been taken when the photographed individual would have had an expectation of privacy (*e.g.*, in bed, a locker room, shower). The military judge found relevance in this.

The military judge found the fact, alone, that Appellant possessed these photos and recordings would be sufficient for the Prosecution's stated purposes. He continued, that as was the case with the 4 August 2022 video, Appellant's state of mind in the commission of both the uncharged acts and the acts alleged in Charge III were sufficiently similar to make the evidence of the prior acts relevant on the intent element of the charged offense. The military judge also found that this evidence could lead the factfinder to believe Appellant had the motive to enter DF's room and touch his feet because the proffered evidence established Appellant's interest in feet and that could have driven him to commit the offense alleged in Charge III. The military judge once again conducted a Mil. R. Evid. 403 balance test as to this evidence and found because the volume of images and videos of feet was not great and not over a large period of time, the prejudice was not high. Additionally, the military judge found that the aim of this evidence was not to paint Appellant as a bad person, but instead to show the timing, quantity, and nature of the photos found. The military judge further found that because the trial was judge alone, there was no danger that the factfinder would be confused or misled by the evidence or that the testimony would lead to undue delay or waste of time. The military judge ruled that he would allow testimony generally describing the timing, quantity, and nature of the photos and recordings found on Appellant's cell phone for its tendency, if any, to show Appellant's motive and intent to commit the offense alleged in Charge III, to show Appellant's interest in feet, and to explain why Appellant may have committed the offenses alleged in Specification 2 of Charge II and the Specification of Charge III.

We again find that the military judge's findings of fact were based on the evidence before him and as such, he was not clearly wrong in his determination of the facts. We also find that the military judge's conclusion that the evidence, consisting of testimony about photos and videos of feet, was relevant to show intent and motive and was not an erroneous view of the law. Similar to the issue above, the testimony regarding about 245 photos of other individuals' feet and the allegations in Charge III show a fascination to be around feet. This evidence goes directly to Appellant's intent and motive of engaging in conduct

that would put him around people's feet. We conclude that the military judge did not abuse his discretion in denying the Defense's motion.

## D. Factual Sufficiency

Appellant was convicted of assault consummated by a battery upon DF in violation of Article 128, UCMJ. He claims that the Prosecution failed to prove beyond a reasonable doubt that he touched DF's foot with his hand. We disagree.

### 1. Law

A new factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. *See* The National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116–283, § 542(e)(2), 134 Stat. 3388, 3612–13 (1 Jan. 2021). This new version of Article 66(d)(1), UCMJ, provides:

> (B) FACTUAL SUFFICIENCY REVIEW.
>
> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.
>
> (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>
> (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1) (*Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*).

The requirement of "appropriate deference" when a Court of Criminal Appeals weighs the evidence and determines controverted questions of fact "depend[s] on the nature of the evidence at issue." *United States v. Harvey*, 85 M.J. 127, 130 (C.A.A.F. 2024). This court has discretion to determine what level of deference is appropriate. *Id.*

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at 131 (internal quotation marks omitted). For this court "to be clearly convinced that the finding of guilty was against the weight of the evidence, two requirements must be met." *Id.* at \*132 (internal quotation marks omitted). First, we must find the evidence, as we weigh it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we "must be clearly convinced of the correctness of this decision." *Id.* When reviewing for factual sufficiency, we keep in mind "the factfinder at the trial level is always in the best position to determine the credibility of a witness." *United States v. Peterson*, 48 M.J. 81, 83 (C.A.A.F. 1998).

In order to convict Appellant of assault consummated by a battery, the Prosecution was required to prove that Appellant (1) did bodily harm to DF; (2) that the bodily harm was done unlawfully; and (3) that the bodily harm was done with force or violence. *See Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 77.b.(2).

### 2. Analysis

Appellant requests factual sufficiency review asserting "the evidence admitted at trial d[id] not prove beyond a reasonable doubt that [Appellant] touched DF's foot with his hand." Appellant alleges two factual issues. First, Appellant claims there is a lack of physical evidence supporting his conviction of touching DF's foot with his hand. He does, however, concede that he photographed DF's feet. Second, Appellant claims that "DF's testimony was unreliable and wrought with serious credibility issues."

We have considered whether the challenged findings in this case are correct in fact. After weighing all the evidence and having given appropriate deference to the fact that the miliary judge saw and heard the witnesses, this court is not clearly convinced that the finding of guilty was against the weight of the evidence. Additionally, we do not share Appellant's concerns with DF's credibility. Moreover, nothing in the law requires *physical* evidence to prove that Appellant did bodily harm to DF by unlawfully touching DF's foot. The photographs Appellant took of DF's feet and DF's testimony about feeling Appellant touching his foot, feeling a "rhythm or massage" and "a constant rhythm," a "circular motion," are lead us to conclude the evidence was factually sufficient for conviction.

**E. Excessive Delay in Post-Trial Processing**

Appellant claims that the 196 days from sentencing to the docketing of his case with this court is unreasonable and warrants relief.[14] We find no relief is warranted.

**1. Additional Background**

The military judge sentenced Appellant on 2 May 2023. The court reporter took 111 days to transcribe the record of the proceedings, resulting in 605 pages. The court reporter began transcribing the case on 9 May 2023, but did one day of "admin work" for this case on 8 May 2023. She also took approximately 19 days of leave between the end of the court-martial and putting the "court reporter package" together on 21 August 2023. Between 2 May 2023 and 21 August 2023, the court reporter spent four days of "admin work" working on this case and 30 days working on other cases.

In addition, the base legal office took 63 days to put the record of trial (ROT) together. On 22 August 2023, the case paralegal received the transcript from the court reporter. After what appears to be steady progress, the case paralegal mailed the ROT to the Air Force Appellate Records Branch (JAJM) on 24 October 2023. This court received the ROT and docketed the case on 14 November 2023. Appellant requested and received six enlargements of time to file his initial brief with this court. He filed that brief on 25 July 2024.

**2. Law**

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 632 (A.F. Ct. Crim. App. 2020) (citation omitted).

In a due process analysis, a presumption of unreasonable delay arises when a case is not docketed with this court within 150 days from sentencing. *Id.* at 633 (citation omitted). This period, like *Moreno*'s 30-day standard for action to docketing, "is not, by any means, a particularly onerous processing goal." *United States v. Gay*, 74 M.J. 736, 743–44 (A.F. Ct. Crim. App. 2015).

> In fact, a delay in [the action-to-docketing] phase of post-trial processing is "the least defensible of all and worthy of the least

---

[14] Appellant addresses the time between docketing and completion of appellate review but does not allege any error. In his brief, Appellant's counsel asserted Appellant's right to timely appellate review, and explained Appellant took 255 days to file the appeal even after the case was docketed with our court because counsel "had cases to review before [Appellant's] case."

> patience. . . . [T]his stage involves no discretion or judgment; and, unlike an appellate court's consideration of an appeal, this stage involves no complex legal or factual issues or weighing of policy considerations."

*Id.* at 744 (quoting *United States v. Dunbar*, 31 M.J. 70, 73 (C.M.A. 1990)).

A presumptively unreasonable delay triggers an analysis of the four factors in *Barker*, 407 U.S. at 514. These are "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). While a presumptively unreasonable delay satisfies the first factor, the Government "can rebut the presumption by showing the delay was not unreasonable." *Id.* at 142.

"A finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Article 59(a), UCMJ, 10 U.S.C. § 859(a). When assessing prejudice, "we consider the interests of prevention of oppressive incarceration pending appeal; minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and limitation of the possibility that . . . grounds for appeal, and . . . defenses in case of reversal and retrial, might be impaired." *United States v. Cabuhat*, 83 M.J. 755, 773 (A.F. Ct. Crim. App. 2023) (en banc) (citation and quotation omitted). In the absence of such prejudice, a due process violation exists only when "in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Even in the absence of a due process violation, this court "may provide appropriate relief if [an appellant] demonstrates . . . excessive delay in the processing of the court-martial after the judgment was entered into the record." Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2).

### 3. Analysis

Appellant makes three arguments as to why he is entitled to post-trial processing relief. First, Appellant claims that the "delay has interfered with his ability to exercise his appellate rights." Second, he claims that if we do not find prejudice, we should nevertheless find a due process violation as the delay adversely affects the public's perception of the fairness and integrity of the military justice system. Third, Appellant argues that if we do not find a due process violation, we should still grant him relief because the Government acted with gross indifference as he suffered harm, and relief is consistent with the goals of both justice and good order and discipline.

As this case was not docketed with this court within 150 days from sentencing, a presumption of unreasonable delay arises. Therefore, we conduct an analysis of the four *Barker* factors.

Here, the delay exceeded the 150-day standard by 46 days, approximately 30 percent. This factor weighs in Appellant's favor. The Government's explanation for the delay amounts to slow progress by the case paralegal and by the court reporter who was tasked to complete other duties. Therefore, the reasons for delay weigh in Appellant's favor. Regarding Appellant's assertion of the right to timely processing, it appears Appellant never asserted a right to speedy post-trial processing. This weighs against Appellant. Finally, as to prejudice, Appellant argues that he "was unable to petition this [c]ourt for relief sooner." Given his numerous grants of extension of time to file his initial brief, we see no merit in this argument.

In balancing the factors, and absent prejudice, we find the delay involved in Appellant's case has not been so egregious as to adversely affect fairness or the perception of the military justice system.

We also conclude there is no basis for relief under Article 66(d)(2), UCMJ, in the absence of a due process violation. Considering all the facts and circumstances of Appellant's case, we decline to exercise our Article 66(d), UCMJ, 10 U.S.C. § 866(d), authority to grant relief for the delay in completing appellate review.

### III. CONCLUSION

As entered, the findings are correct in law and fact, Articles 66(d), UCMJ (2024 *MCM*). In addition, the sentence, as entered, is correct in law and fact, Article 66(d), UCMJ, and no error materially prejudicial to the substantial rights of Appellant occurred, Article 59(a), UCMJ, 10 U.S.C. § 859(a). Accordingly, the findings and sentence are **AFFIRMED.**

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court